Willett is going to participate with us in this oral argument remotely. He will also participate in the conference that we have after this morning's arguments. I will call the first case, 23-50632, United States of America v. Greg Abbott. Thank you, Judge Douglas, and may it please the Court. The United States asserts that a waterway is navigable and thereby subject to federal jurisdiction if, one, the United States Army has ever investigated whether it can be navigated, two, it can presently be crossed, or, three, it can be theoretically made to accommodate light commercial craft through the investment of potentially infinite resources. Because literally any waterway meets at least one of those conditions, such a sweeping assertion of jurisdiction cannot be reconciled with either the relevant statute or our constitutional structure. It is particularly concerning here, where, coupled with the United States' position, that it is entitled to enjoin the state from taking action to protect its citizens against violent criminal activity without any showing of harm to commercial shipping. Because the district court accepted that view, it should be reversed. I'm going to start with navigability, both because it is the jurisdictional hook from which the Rivers and Harbors Act leans, and it is also the easiest way to resolve this appeal. The United States has repeatedly conceded, including on page 9 of its brief, that navigability is a question of fact. As the proponent of a preliminary injunction, the United States, therefore, was required to make a—to show a substantial likelihood of proving that fact at trial. The United States has not even attempted to do so using the standard that the United States Supreme Court set out over a hundred years ago, ironically in a case that found a stretch of the same river to be non-navigable. That test requires a segment-by-segment analysis that the Rio Grande, in its ordinary course, is or has been used or susceptible to use as a highway of commercial traffic using traditional means of transit or trade on water. That analysis is very fact-specific and is admittedly hard to do for this Court because the United States has not even told us between what two points on the river the highway supposedly travels. The District Court picked a spot that is at the—that basically runs from the Falcon Reservoir to the Amistad Reservoir, a distance of about 400 miles, because that is the period or the segment that is covered by the only piece of evidence the United States has offered. A 1975 report that on page 1104 of the record found that there had never been traffic commercially on this area, there was not at that time, and there was no plan to be in the future. That does not suffice. Indeed, there is not any evidence or really serious dispute that there is navigation presently on this section of the Rio Grande in the relevant sense, that is, as a commercial highway. And that is in—I would point the Court to Oklahoma against Texas, where the Court discussed what that means. There is no dispute that this piece of river is somewhere between 1 1⁄2 and 3 feet deep. The only evidence of actual watercraft in the water are airboats that are incapable of carrying commercial goods. As a result, they have to rely on cross-river traffic in order to establish navigability, but that is not navigation in the sense of a commercial highway, any more than traveling over a bridge would be, because the river from south to north in this instance is not a highway of commerce, it's an impediment to it. So there's no present traffic. So no worries, they say, there has been past traffic. But again, they point to that 1975 report, and the only instance where that report found a boat to have ascended the river as far as Eagle Pass is an 1850 exploratory mission commissioned by General Patterson of the United States Army to determine whether it could be navigable. It found, and as described, it was an astonishing penetration of the river with so little water and required them to get out or pull over numerous obstacles. That is not, as the Sixth Circuit found in the 1980s, and if we needed any further evidence that the United States Army actually found the river to be non-navigable, one need look no further than the fact that the United States Army never went back, nor did the Texas legislature or anybody else actually commission the type of very expensive improvements that would have been required to allow commercial navigation. So again, the United States pivots and says, well, you can look at the future, it's possible that it's navigated. And the 1975 study did say it was physically possible. That is not the test either. Our position is that the future navigability is not relevant under the Rivers and Harbors Act, because as we explained in our brief, unlike the Power Act, which is the source of the Appalachian Power case upon which the United States relies, the Act does not allow for consideration of the river in its improved state. For panelists, do they solely focus on the 1975 study, or do they also refer to congressional enactments or other cases that may have intimated that there was past use? So the District Court relied on a number of older treaties, as well as a couple of cases showing ferries. But again, ferries from cross-river traffic are not sufficient to show navigation. Appalachian Power, upon which the United States relies significantly, amply demonstrates that, because there were ferries there as well, and the Court did not deem that by itself to be sufficient to show navigation. Instead, there were more than a dozen verified instances as well of traffic going up and down the river, and that is what is absent here. What is the significance in this record of that dam in the fact that the water level in the river can be increased or decreased by virtue of what water is allowed over the dam? Under this instance, it is taken into account for what is the ordinary course or what is the ordinary condition of the river, but the river in the 1975 study, the Army Corps of Engineers seems to express doubt that there would be enough water ever coming over that dam to give consistent passage for boats. And that is in large part because the United States has not offered any evidence about what it would take to change the course of the use of that dam, presumably significant amounts, given that the fifth priority for navigation is actually established by both treaty and statute, so that would have to be a significant amount of water. In fact, a 1972 case called Crow, which we have cited in our briefs, actually showed that for commercial navigation, not only would you need more water, but you would need a hundred feet wide channel nine feet deep. And at the moment, the river is more like 18 inches deep, and it is rocky on the bottom. So to get the necessary channel, you would not just need to dredge, you would need to blast a canal that is five times the size of the Panama Canal and find enough water to fill it. The United States has not made any effort to suggest or to prove even a substantial likelihood of evidence that they will be able to establish that at trial. As a result, they have not shown a substantial likelihood of showing past, present, or future navigation without, or navigabilities, I apologize, and without that, there is no preliminary injunction. If the Court were to disagree with me on that, there is still not a violation of Section 10 of the Rivers and Harbors Act, because there is no obstruction and or relevant structure. And the obstruction analysis here goes back to the problem about their future navigability analysis. How do you define obstruction? An obstruction has been defined in Republic Steel as something that tends to destroy the navigable capacity. And that is in contradiction, sorry, in contradistinction to Rio Grande, page 703, where the Court said a temporary obstruction is not subject to challenge under the Rivers and Harbors Act. So it needs to be permanent, and it needs to be significant. They have not shown either in this particular instance, in large part because they haven't The Rio Grande, the prior Rio Grande case says that an object just needs to substantially interfere with the navigable capacity, not necessarily destroy it. Is that incorrect? It needs to substantially interfere in the sense there has to be some type of long-term or permanent obstruction. But Republic Steel did clarify later that it does need to be destroyed. It's not just any obstruction that is temporarily an impediment. It has to be some sort of significant reduction in navigable capacity, which means that the Court needs to first determine there is navigable capacity, which is why a future analysis based on hypothetical future capacity does not make a lot of sense in the context of this statute, because it's not yet come into being. But as a result, here, the undisputed testimony is that these buoys are temporary. They are designed to be tactical and moved, and that does not create the type of long-term obstruction that Your Honor is pointing to in Rio Grande. There they were talking about a dam, which is obviously a very different structure than a buoy. Also a dam is on the list of structures, or different types of dams, frankly, are on the list of structures in Section 10 as well, whereas a buoy is not. And the United States' own witness admitted multiple times that this was not any of the types of structures listed. So the Court said, well, it's a boom, or it's a list of other structures. But if you take the other structures as broadly as the Army Corps of Engineers has, which in their regulations is literally any obstruction, then there's no point for the previous list that Congress set out. It also conflates different parts of the statute, because an obstruction, which is a significant long-term interference, requires a permission split by Congress, whereas opposed to a structure requires permission from the United States Army Corps of Engineers. There are obviously two different concepts, and should not be conflated. And as a result, because there is neither navigable capacity, nor an actual structure or obstruction impeding that navigable, or destroying that navigable capacity, again, no preliminary injunction. If you had to give me your best site that the obstruction had to be permanent, what would that be? Rio Grande, page 703, as well as the Republic Steel, which discusses destruction. And I'm afraid I don't have that page on me, but I can look for it before rebuttal. It's also implicit in the concept and in the types of Pretty much all include moorings into the ground, which is an implication that there is some sort of excavation, and that these things aren't moving. By contrast, a buoy is floating and is anchored, but not dug into the ground. They are different concepts. They are different structures. They are different under the statute. Indeed, the United States nowhere responds to our argument about section 14 and 15 of the Rivers and Harbors Act, which treats the buoys as different from the types of works and structures that are built into the statute, that are built into section 10. So as a result, again, no navigability, no jurisdiction, no structure or obstruction, no claim. They also haven't shown the balance of the equities as required in this under winter. Instead, they have repeatedly asserted that they do not have to, because this is a generalized public interest statute. But the district court analyzed them anyway. Is that correct? They did, but the district court's findings of fact are clearly erroneous, as there is literally no evidence to support them. For example, the district court said that there was a concern about human safety, but the United States' own witness at ROA 426 and 1379 admitted that there was no concern about human safety. There was a concern about generalized concerns with Mexico, but we know that's not sufficient to obviate Texas' police powers because Medellin said so. So the district court made some findings about the equities, but they're unsupported by the record and therefore cannot support an injunction. Was the floating barrier ever on the Mexican side of the Rio Grande? Our view is no, that we had put it down using GPS to determine, to make sure that it was on the United States' side of the border. The IBWC concluded that we were wrong and that we were slightly over the line for about two-thirds of it. Texas, when that was raised to them, moved it voluntarily four feet backwards towards the United States' side so that any concern about being in Mexico was obviated. That was not, as the district court has thought or as the United States has periodically suggested, that the water had shifted or had made them to migrate. It had simply a good-faith error, to the extent there was an error at all, about where they were placed. That has now been addressed. As a result, that does not support the injunction either. If the court has no further questions, I'll see you at rebuttal. Mr. Gray? Good morning, and may it please the court. My name is Michael Gray. I'm here on behalf of the United States. Texas violated the Rivers and Harbors Act of 1899 in two ways when it was a navigable river under the statute. First, Texas obstructed the river's navigable capacity without congressional authorization. Second, it built a boom or other structure in the river without a permit from the Army Corps of Engineers. The United States demonstrated in the district court that it's likely to prevail on both grounds when either would suffice and that the equities favor a preliminary injunction while the case proceeds. The district court did not abuse its discretion in granting the preliminary injunction, and this court should immediately dissolve the administrative stay, deny Texas' motion for a stay pending appeal, and affirm. I'll start where opposing counsel did and speak to navigability. I think it's telling that there's very little talk of either Appalachian electric power or economy light in opposing counsel's comments. Appalachian electric power makes clear that the Rivers and Harbors Act preserves Congress' authority over rivers that are capable of serving as channels of commerce and that that can be shown in either by historical navigability or by the capacity for future navigability. Here, the district court correctly found the As to historical navigability, the court pointed to the two cases talking about ferry traffic in the area, and they say ferry traffic isn't good enough. Well, ferry traffic in this instance was expressly commercial enterprises. In fact, one of the cases was resolving a claim between competing firms, ferrying cotton across the Rio Grande, and expressly commercial enterprises engaged in foreign commerce. That makes sense as the river forms the border for the entire length with Texas, and so any cross-river traffic, commercial traffic, is going to be foreign commerce and fall within Congress' powers that it preserved under the Rivers and Harbors Act. We also pointed, and the district court pointed, to four acts of Congress that preserve navigability, and they say, well, those were only precautionary, like in Oklahoma v. Texas. But Oklahoma v. Texas considered the equal footing doctrine where the test is, is it navigable under its normal conditions at the time of statehood? The Rivers and Harbors Act, by contrast, and the statutes here deal with could it be preserved, could it be made a channel of commerce, and Congress preserved in those statutes by saying that navigability, free navigation, shall not be impeded, and keeping to itself the ability to enforce that in the federal courts, preserved the river for commerce. We also have the expedition that was mentioned, and it's true, there was one expedition that went far above Eagle Pass, but if you look, for example, at Appalachian Power, there was a similar expedition that only made it halfway up the relevant stretch, and the court concluded that that was evidence also of navigability. And it's clear that there would be, even in the 1850s, they thought, with some reasonable improvements, the river could be made navigable. So as to future navigability, the court concluded that its natural condition was susceptible, its flow, the gradient. If you look at Appalachian Power, there it was a mountainous stream with ledges and rocks and falls, and the court there said, she said, nine feet we gotta have. The court in Appalachian Power said two feet above the rocks and ledges was enough. Here, it's not just the Amistad Dam that holds water, but you have Elephant Butte, you have Cabello, that hold significant water and divert it for irrigation. Congress could choose to reprioritize that water for navigation down the Rio Grande, and what the Rivers and Harbors Act does is preserves Congress's ability to do that. The fundamental question is, who decides about this river? I mean, who makes the core decision about the river? And it's what your answer is, Congress makes the core decision about this river. Congress makes the core decision. Well, you got the federal courts now, don't you? No, that's good. Yes. And, you know, the Supreme Court opinion support that, you know, Congress gets to preserve its ability over the channels of commerce. And really, this case has a lot of similarities to Appalachian Electric Power. You know, there, for example, there were the falls. The court said that navigation was not large and it seized with the railroads. The 1819 survey went halfway up and encountered considerable difficulty in some spots. The court referred to isolated bits of boating. And you have that here. You see even the federal government uses small draft boats on the river now. And the court in Appalachian Power said, nor is a lack of commercial traffic of bar or personal or private use by boats demonstrate the availability of the stream for the simpler types of commercial navigation, that's enough. You have even the kayak company here that operates on the stream, showing that it can be navigated. And so the totality of the evidence together demonstrates that this is a navigable river under the Rivers and Harbors Act. Now, on obstruction, the district court made... The navigability question is a fact question. It is. The navigability question is a fact question. And what the district court concluded was that at the preliminary injunction stage, all of that evidence was deficient to show a likelihood of success. And we will have to bolster the evidence and, you know, show that navigability at the merit stage as well. But that significant evidence of navigability is sufficient at this stage to establish it. On obstructions, the district court made, I think, three critical factual findings on those. I mean, first, the court concluded that the credible testimony establishes that the placement and tandem configuration presents a structural barrier to cross-river navigation, which of course it was designed to do. Second, it impedes navigation up and down the river because vessels would have to take note of and make sure to avoid it. It would present a serious risk to watercraft of any kind. And third, because of the other conditions in the river with the shallows and rough spots, it said free reign of the entire width and a clear view of all obstacles is important. Now, the council said that obstructions are only if they destroy and have to be permanent. But the Raven case from this court, I think, puts that to bed. You know, this court found that an 83-foot schooner that was sunk to the easterly shore of the St. Johns River at a point at Goodby's Creek, where the St. Johns River is more than two miles wide, was an obstruction to navigability, to the navigable capacity of the river. And certainly, if that or the houseboat cases are obstructions to connected with concrete anchors to the riverbed, is also an obstruction to navigable capacity. Council talked about structures. Unless the court has questions on that, I think it's clear that this is at least another structure under the Act. On irreparable harm, the purpose of these structures, the government's purpose of these structures is, how would you say it? Texas' purpose for the structures is to block people from crossing the river. It's to obstruct cross river. That's what they're there for. That's their entire reason for being, according to Texas. So I think it's fair to say that they do so. On irreparable harm, the district court, I think, correctly found two different kinds of harm here. First, there's the harm in the coordination immediately with Mexico, and there's good evidence that the district court relied on in the QAM declarations. She's the primary advisor to the State Department on border issues, that this is of significant diplomatic concern and a major irritant that Mexico... Is there any evidence in the record that moving the barriers over to the riverbank is going to ease that diplomatic tension? No. There's no evidence of that in the record. Mexico has expressed its concerns through various diplomatic channels, which are outlined in the QAM declarations, also the Pena Declaration and the QAM testimony at the hearing talks about how it's harming the coordination with the IBWC and harming water deliveries, where Mexico canceled a meeting. So it's having... We may not be as willing to engage as a willing partner on a whole host of issues, and so it's having immediate impacts that are irreparable on those. But there's also the barrier impedes... They've never addressed this, the federal operations on the river. There are three declarations in the record, one from the Border Patrol, one from the IBWC, and one from the Coast Guard that all say that those agencies use boats on the river, and the district court found that this would be a risk to any sort of watercraft, and so the district court's reporting on that front is also well supported and not clear error. I believe I've addressed everything. I would ask again, in conclusion, that the court affirm and that it immediately dissolve the administrative state and deny the motion for state pending appeal, as we've shown a likelihood of success on all of the elements of the claim. Thank you. Thank you, Your Honor. On a couple of quick points. First, the pages of Republic's deal that I was referring to, Judge Douglas, were page 487 to 488. In reference to the permanent obstruction, if anything, Raven proves my point. It had been... The schooner in question had been abandoned, so it was effectively permanent, even if it could nominally be removed. Turning to the last point that my opposing counsel has suggested, that there is evidence that... Correct me if I'm wrong, but the record, as far as whether or not these are permanent or how easy they would be to remove, says that, if anything, it would take, like, several weeks and heavy equipment and at least $300,000 for you to remove those. Is that an incorrect... To entirely remove them, it would take an amount of time, a couple of weeks, yes. However, there is... The evidence in the record is also that they are temporary and designed to be so. So, they are not permanent in the sense of either an abandoned schooner or appear, as discussed in the statute. And then, counsel referred to evidence of obstruction downstream. Respectfully, his own witnesses admitted that that's not true. Page 440 of the record on Mr. Gomez, transcript to page 32 for Mr. Shelnut. The same thing goes to their accusation that this is impeding federal operations. I would point your honors to page 445 to 46, where Mr. Gomez, again, admitted that wasn't true. And page 491, where, upon cross-examination, so did Mr. Shelnut. Moving to their larger legal arguments and criticizing me for not talking about Appalachian Power. I would point your honors to footnote 26 of that opinion, which discusses how, in the Rio Grande case, the record contained reports of Army engineers that improvements necessary to make the river navigable would be financially, if not physically, impracticable because of the many millions of dollars that would be required. The record here does not dispute that assessment. And the new river in Appalachian Power is fundamentally different than the river here. And that is why Appalachian Power expressly distinguished the river here. And in that case, despite the expedition to which my colleague referred, the river didn't, the court did not find that sufficient. To the contrary, the court said that there were a wide variety of factors that led to a conclusion of navigability, including the actual use of the river for down-river, up-river navigation. That is what is absent here. And to point to your point, Judge King, about who makes the core decision, there are a couple of different parts of that. The one is who makes the core decision about whether or not the river is navigable. That's for the federal courts to decide. The United States Supreme Court has said so. So has the Army Corps of Engineers. And to date, the court has not decided that, except to the extent they decided in the Rio Grande case that a portion of the river that is as close to Eagle Pass as portions of the river that are demonstrated to be navigable, it's about halfway in between the two of them, were not navigable. So the question is one effect that the United States has not portrayed or has not offered evidence to demonstrate. There's also a second question, which as the Supreme Court has said, is the question of who makes the core decision. And I would point your honors to page 679 of that opinion, where the Supreme Court said, and I quote, regulation of land and water use are at the core of traditional state authority. It is only where Congress has come in and said that we are preempting for commercial purposes or some other purpose allowed by the Constitution that the states lose that authority. As we've argued here, that only happens under the Rivers and Harbors Act if there is a navigable river. The United States has, since this case come to the court, amended to assert there's a problem under the Treaty of 1848. But that's a different claim and one that wasn't the basis of this injunction. They may have other claims that they are welcome to bring, but they chose as the master of their complaint to pursue a claim under the Rivers and Harbors Act, which required them to show that this piece of the Rio Grande is navigable. They haven't even said what that piece is, let alone that it could actually be used as a highway for commercial navigation. That was their error, and as a result, the district court's injunction cannot be sustained. Thank you. Thank you. Case is submitted.